IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| Essex Parts Services, Inc., and Richard Martin,<br><br>      Plaintiffs,<br><br>vs.<br><br>Brembo, NV, and AP Racing, Ltd.<br><br>      Defendant. | Case No. CaseNumber<br><br>**COMPLAINT** |

## INTRODUCTION

This lawsuit is brought by Essex Parts Services, Inc. and Richard Martin against Brembo, NV and AP Racing, Ltd. It arises from a blatant attempt by defendant Brembo to interfere with a five-year commercial agreement Essex was about to enter into with AP Racing. The terms of the agreement had been commercially agreed upon in principle, but Essex has now been forced to reject the agreement due to Brembo's eleventh-hour attempt to extort money that is not owed. Brembo, who was not a party to the contract, premised its claim for additional money on a fraudulent transfer claim it had been told by a U.S. Bankruptcy Court that it did not own. As part of this scheme, Brembo proposed that Essex and AP Racing participate in a scheme that would disguise the payments as purchases by Essex from APR. Essex and Martin will sustain significant damages because of Brembo's actions, and this lawsuit seeks compensation for those outrageous actions.

## THE PARTIES

1. Plaintiff, Essex Parts Services, Inc. ("Essex"), is a corporation organized under the laws of North Carolina with a registered address at 125 Hampton Court Cramerton, NC 28032-1445.

2. Plaintiff Richard Martin is an individual residing at 255 Cavedale Road, Sonoma, CA 95476. Mr. Martin is and has been at all relevant times the majority shareholder of Essex and was formerly the majority owned of TAW.

3. Defendant, Brembo NV ("Brembo"), is a corporation organized under the law of The Netherlands, with a principal place of business at Curno (BG), Italy, 24035, Via Brembo, 25.

4. Defendant AP Racing Ltd. ("APR"), is a registered corporation organized under the laws of the United Kingdom with registered office at: Seven Stars Ind Est, Wheler Road, Coventry, West Midlands, CV3 4LB.

5. Brembo is the parent company of APR and one of the largest manufacturers of performance automotive brakes and parts in the world.

## JURISDICTION AND VENUE

6. Jurisdiction of this action is proper pursuant to 28 U.S.C. § 1332 in that the parties are citizens of different states, diversity is present, and the amount in controversy is in excess of $75,000.00.

7. Venue is proper in the Western District of North Carolina under 28 U.S.C. § 1391 because Essex resides in this district and a substantial part of the events giving rise to the claim occurred in this district.

# FACTUAL BACKGROUND

A. **The Parties and the Business Relationships**

8. For many years, Essex has faithfully acted as the sole distributor, and exclusive reseller, of certain APR products in the United States. Since the 1980's, APR and Essex have entered into various written agreements governing their relationship, including multiple distributor and sales agreements.

9. So close was the relationship between APR and Essex that an APR employee, Steve Hood ("Hood"), emigrated from England to the U.S. and worked at Essex's facility in Cramerton, NC, as an employee of Essex for many years. In 2022, APR started doing business in Charlotte under a new corporation known as AP Racing North America Corporation and Hood left Essex to become an employee of that company where his role is primarily factory liaison, technical team support person, and solicitation of OEM business outside the scope of the Essex Agreement.

10. APR was a separate company that had no connection to Brembo until 1999, when Brembo acquired ownership of APR. Since that time, upon information and belief, Brembo has appointed APR's board and management, although the company claimed it operates independently of Brembo.

11. The most recent distribution agreements between Essex and APR are dated March 28, 2022 and May 18, 2022 (the "APR Agreements"). Under the APR Agreements, Essex agreed to exclusively sell and promote APR products through various channels, including providing brakes and parts to all NASCAR Cup series teams.

12. APR and Essex have a long history together in selling and servicing the NASCAR market in Charlotte. APR first sold brakes to a NASCAR cup car team in 1987 as a

result of the efforts of Essex. Over time, the substantial investments of Essex established APR as the predominant Brand in NASCAR.

13. In 2022, APR became the exclusive supplier of brakes to NASCAR Cup teams. This was the culmination of many years of work by APR and Essex. Essex was and remained the exclusive North American distributor of APR brakes to NASCAR Cup teams.

14. So successful was Essex as a distributor for APR that Brembo itself sought the support of Essex in distributing its products in the U.S. Brembo has regularly communicated with Essex on products outside the scope of the APR Agreement and even sought out Essex's help in marketing a product in the U.S.

15. Essex was not merely a 'Distributor,' but the 'exclusive reseller' for the United States territory. This granted Essex the right to capture all revenue streams for the products covered by the Agreement, including direct OEM/Factory-to-Private Team sales.

**B. Brembo's Litigation against T.A.W.**

16. In 2014, Brembo entered into an exclusive distribution agreement with T.A.W. Performance LLC ("TAW") for motorcycle brakes (the "TAW Agreement"). Richard Martin was the majority owner of TAW. As part of the consideration for the TAW Agreement, TAW paid $1,000,000 to a third party to obtain the exclusive distributor and reseller rights and resolve a claim against Brembo by the prior distributor through a release.

17. At the time Brembo entered into the TAW Agreement, it was aware that TAW was a separate company from Essex with different officers, employees and facilities. Brembo was also aware that Essex would have no liability for the debts of TAW.

18. Under the TAW Agreement, TAW would be the sole distributor and exclusive reseller of certain Brembo motorcycle brakes in the U.S.

19. Although the TAW Agreement was an exclusive reseller distribution agreement, TAW soon found it impossible to compete selling Brembo motorcycle brakes with the same products being imported into the U.S. via E-Bay and similar Internet based sites.

20. TAW complained to Brembo that it was not doing enough to protect TAW's exclusive rights to distribute Brembo motorcycle brakes in the U.S. as it was contractually obligated to do.

21. Although TAW complained to Brembo on countless occasions, Brembo refused to engage with E-Bay or the sellers, or allow TAW to do so effectively on its behalf. The source of the gray market goods were European based companies, supplied by Brembo's Italian Master Distributor   TAW alleged that Brembo was funneling these products to the U.S. through its Italian distributor and taking no action to protect TAW's contractual exclusivity rights.

22. Despite TAW's numerous complaints that Brembo was not doing enough to enforce TAW's exclusive rights, Brembo did little about the gray-market sales in the U.S. of European acquired Brembo motorcycle brake products, paying mere lip service to those complaints

23. In 2016, after a meeting in which Martin confronted Brembo about serious code of ethics violations, Brembo advised TAW that it would be terminating the TAW Agreement and TAW's exclusive distribution rights in the U.S., effective July 31, 2017.

24. Litigation between the parties ensued, with Brembo filing a lawsuit against TAW in New York state court on July 20, 2017, alleging TAW owed Brembo more than $1 million for inventory TAW purchased but was unable to sell due to the price differentials between the gray market products and the legitimate products TAW purchased at higher prices.

5

25. TAW filed multiple counterclaims against Brembo, including breach of contract for not doing more to stop the importation of gray market products. Discovery commenced, numerous depositions were taken, and multiple motions were filed. Ultimately, TAW ran out of money which was according to Brembo's strategy. After several years of litigation, TAW agreed to the entry of a consent judgment in the amount of $969,178.00 and the litigation concluded shortly thereafter.

C.  **The Bankruptcy of T.A.W.**

26. On January 29, 2024, TAW filed for protection from its creditors under Chapter 7 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Northern District of California. The case was docketed at No. 24-10046 (the "TAW Bankruptcy Case"). Brembo received notice of the bankruptcy filing, was listed as a creditor, and actively participated in the TAW Bankruptcy Case.

27. The two largest creditors were Brembo, and TAW's sole Member, Richard Martin, who submitted a claim for $1,012,716.

28. The TAW Bankruptcy Case afforded Brembo the opportunity to investigate any potential liability of third parties for the debts of TAW. Brembo did seek to investigate potential claims against others for the money TAW owed creditors, but it delayed too long and only took action when it was too late.

29. Brembo filed a Motion in the TAW Bankruptcy Case to conduct the examination of TAW to investigate potential fraudulent transfers pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, but Brembo's motion was filed several months after the case had been closed.

30. In response to Brembo's Motion, the Bankruptcy Court completely rejected Brembo's eleventh hour attempt. In doing so the Bankruptcy Court noted a fact that should have shut Brembo down from seeking to recover money from Mr. Martin or Essex in the future.

31. The Bankruptcy Court explained to Brembo in its order that:

> "even if [Brembo] were to conduct a 2004 examination and obtain information regarding fraudulent transfers, those causes of action would belong to the estate and the chapter 7 Trustee. *See* 11 U.S.C. §§ 547, 548 and 550. [Brembo] had the opportunity to present any concerns and/or information to the chapter 7 Trustee when the case was pending. [Brembo] either failed to do so or failed to convince the chapter 7 Trustee of the merit of any concerns."

**D. Brembo's Efforts to Force Essex to pay the Claims Against TAW**

32. Brembo's efforts to seek money from Essex for the claims it has against TAW are part of a continuing pattern of unfair trade practices that culminate in its recent decision to prevent APR from entering into a new contract with Essex unless Brembo could extort monetary concessions or coerce Essex to enter into what amounts to an accounting fraud by APR.

33. On August 1, 2022, the Chief Operating Officer of Brembo's Performance Division, Mario Almondo ("Almondo"), wrote to Richard Martin stating that if TAW did not settle the lawsuit Brembo filed, "I do not think it likely that Essex will be able to avoid involvement." This was in response to an email in which Mr. Martin clearly explained that Essex and TAW were completely separate companies with different ownership and management,

34. On October 10, 2022, legal counsel for Essex in London sent a letter to Matteo Tiraboschi and Daniele Schillaci, the Board Chairman and Chief Executive Officer of Brembo, respectively, demanding clarification of statements such as the ones Almondo made in connection with Brembo's claims against TAW.

35. Despite this admonition, Brembo's unlawful efforts to assert claims against Essex for the debts of TAW continued, as is evident by its efforts in the TAW Bankruptcy Case. Brembo sought to reopen the Bankruptcy Case so it could investigate claims of fraudulent transfer but the Bankruptcy Court shut down this attempt and clearly instructed Brembo those are not claims it owns.

36. Claims brought to recover money owed to TAW must be brought by the Chapter 7 Trustee for the benefit of all of the creditors, not just Brembo, according the Bankruptcy Court and the Bankruptcy Code. By seeking to recover money only for itself, Brembo was effectively seeking to deprive all the other TAW creditors from participating in a fair recovery based on the claims submitted in the Bankruptcy Case

37. Despite admonitions from counsel and the clear instruction from the Bankruptcy Court, Brembo continued to try and collect the TAW debt from Essex and Mr. Martin.

1. **Brembo's Extortion**

38. Brembo's efforts to collect from TAW continued even though the TAW Bankruptcy Court was clear in its admonition that the claims belonged to the Chapter 7 Trustee and there was no case Brembo was authorized to settle.

39. In December 2025, Mario Almondo wrote to Richard Martin demanding $350,000 in compensation from Martin, Essex, or both of them for the claims against TAW. Although the email was stated in the form of "settlement discussions" and referred to prior discussions with TAW's attorney, Almondo made the demand to Mr. Martin and Essex and not to TAW's legal counsel and as part of an effort to threaten the recently agreed upon contract between APR and Essex.

8

40. Brembo did not have the right to make a demand upon Essex as part of the new contract based on the TAW debt which Brembo did not even have the legal right to collect.

2. **The Fraudulent Inventory Accounting Scheme**

41. Brembo next approached Essex with a fraudulent inventory accounting scheme in order to attempt to recover the TAW debt from Essex.

42. As part of this scheme, Brembo demanded that Essex commit to minimum purchase requirements from APR that were $250,000 more for each of the five years the new agreement would be in place. As was true with the prior demand, Brembo had no right to claim money owed by TAW should be paid by Essex or that Brembo was entitled to collect TAW's debts directly, to the exclusion of other TAW creditors, and not to have all monies reported and delivered to the Chapter 7 Trustee for the benefit of all the TAW creditors.

43. To conceal this latest demand, Brembo devised its fraudulent inventory scheme. Under this scheme, APR would account for this new revenue by attributing it to higher sales to Essex, even though it was demanded from Essex to payoff the TAW debt. All of these demands took place after APR and Essex had agreed to the new contract without these additional payments.

3. **Defendant's Bad Faith, Deception and Selective Disclosure**

44. In December 23, 2025, Richard Martin signed the new five year contract with APR. The term had been reduced from a 10-year term by Brembo after Essex and APR had agreed in principal. The contract as signed by Mr. Martin solidified the relationship between APR and Essex for another five years.

45. The new agreement was never counter-signed by APR. As a result of the new demands on Essex related to the attempts to collect the TAW debt, Mr. Martin has now revoked his signature and commenced this lawsuit

46. Also on December 23, 2025, the President of Essex sent an email to its employees celebrating the renewal of the AP Racing contract. In the email he wrote: "I am, extremely pleased to let everyone know that after nearly a year of negotiation, we have today signed a 5 year extension to our AP Racing Distribution Agreement.… I look forward to Essex continuing to build our relationship with AP Racing and increasing both the brand awareness and sales for AP here in North America for years to come."

47. Despite Essex's celebration of loyalty to AP Racing and its commitment, on information and belief, behind the scenes APR and Brembo were plotting to undermine the company so they could take the business for themselves.

48. On or about January 17, 2026, Hood of APR was in Daytona for an upcoming race. Hood approached an Essex employee, Joey Petree, who was pleased to know the agreement had been renewed. Despite an obligation, and under strict instructions from Hamblin, to keep such information secret, Hood disclosed to the Essex employee that the new contract with Essex had not, in fact, been signed.

49. It is believed and averred that Hood made this disclosure for the specific purpose of undermining Essex and setting the stage so that APR could remove Essex, both as a valued partner and as a potential competitor.

50. It is believed and therefore averred that Hood's comments were designed to instill fear in the employees of Essex so that APR and Brembo could hire those employees after Essex refused to accede to their eleventh-hour extortionist demands.

### Essex v. Brembo

### Count I – <u>Interference with Prospective Contractual Relations</u>

51. Paragraphs 1 through 50 are incorporated by reference as if set forth in full.

52. Essex had a valid and reasonable expectation that it would continue to do business with APR.

53. Brembo had knowledge of the existing relationship with APR and that the prospect of future business relationship with APR through the new agreement.

54. Almondo, as Brembo's Chief Operating Officer for Motorsports and by virtue of his role at APR, was able to direct APR to refuse to enter into the new agreement if Essex or Martin did not pay sums that were owed by TAW.

55. Almondo and Brembo's actions were without justification. Specifically, Brembo had no authority to interfere in the business dealings of APR, a separate company. In addition, Brembo had no right to seek to collect the TAW debt since that right belonged to the TAW Bankruptcy Trustee, as the Bankruptcy Court had instructed Brembo.

56. Essex has suffered and will suffer actual damages as a result of the interference by Brembo.

**WHEREFORE**, Plaintiffs Essex and Martin demand judgment in their favor in an amount in excess of $75,000.00 and such other relief as the Court finds just and reasonable.

## Essex and Martin v. Brembo and APR

## Count II – <u>Violation of the North Carolina Unfair and Deceptive Trade Practices Act</u>

57. Paragraphs 1 through 56 are incorporated by reference as if set forth in full.

58. Brembo engaged in repeated and systematic efforts to collect money that was owed, if at all, solely by TAW and that would have, if successful, deprived TAW's other creditors of money that properly should have been collected by the TAW Bankruptcy Trustee.

59. Brembo's efforts to collect this money even continued after the TAW bankruptcy case was closed, and even after the TAW Bankruptcy Court advised Brembo that such claims would belong to the TAW Trustee and not to Brembo.

60. Brembo was one of only a few creditors, of which one was Martin in an amount of $ 1,012,716, in the TAW Bankruptcy and its efforts to collect money owed by others to TAW was an unfair effort to deprive the other creditors, including Martin, of money they would have received had the claim been brought in the TAW Bankruptcy Case.

61. Brembo's attempts to collect on the TAW debt from Essex and Martin were unfair and offended public policy and were immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers.

62. Almondo's statements on behalf of Brembo were purposeful, targeted, and directed communications in an effort to collect a debt for which neither Essex nor Martin are liable.

63. After Essex and Martin failed to accede to Almondo's demands, Brembo prevented APR from entering into a new agreement with Essex for five or ten years.

64. Almondo and Brembo's actions affect commerce, including commerce in North Carolina, including Essex and the NASCAR cup teams located in the Charlotte area to whom Essex provides goods and services.

65. Almondo and Brembo's actions have caused Essex injury by preventing it from entering into a new distribution agreement with APR and depriving them of the substantial benefits available to them.

66. Pursuant to N.C. Gen. Stat. §75-1.1 et seq., Essex and Martin are entitled to treble damages and attorneys' fees for Almando and Brembo's unfair and deceptive actions.

**WHEREFORE**, Plaintiffs Essex and Martin demand judgment in their favor in an amount in excess of $75,000.00 and such other relief as the Court finds just and reasonable.

Dated the 27th day of January, 2026

*s/Peter A. Santos*
Peter A. Santos

Attorneys for Plaintiffs
Essex Parts Services, Inc. and Richard Martin

OF COUNSEL:

Peter A. Santos
Seth Hudson

MAYNARD NEXSEN PC
227 West Trade St.
Charlotte, NC 28202
Telephone: 704-338-5336

205154737.v3 - PSANTOS@MAYNARDNEXSEN.COM