# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CIVIL ACTION NO. 3:26-CV-00072-KDB-DCK

ESSEX PARTS SERVICES, INC.,

      **Plaintiff,**

      **v.**

AP RACING, LTD. AND
BREMBO, NV,

      **Defendants.**

**MEMORANDUM AND
ORDER**

**THIS MATTER** is before the Court on Defendants AP Racing, LTD's, and Brembo, NV's Motions to Dismiss the First Amended Complaint ("FAC") for failure to state a claim and lack of personal jurisdiction. (Doc. Nos. 15, 21). Although the Court concludes it is appropriate to exercise personal jurisdiction over Defendants, for the reasons discussed below, Plaintiff has failed to plausibly allege its claims for interference with prospective contractual relations and unfair and deceptive trade practices arising out of the Parties' commercial relationship. Therefore, Defendants' Motions will be **GRANTED**.

## I.    LEGAL STANDARD

### A.  Rule 12(b)(2)

*The Pleading Standard*

A party invoking federal jurisdiction has the burden of establishing that personal jurisdiction exists over the defendants. *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 226 (4th Cir. 2019). However, when the court addresses the question of personal jurisdiction in a Rule 12(b)(2) motion on the basis only of motion papers, supporting legal memoranda, and the

1

relevant allegations of a complaint, the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis to survive the challenge. *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016). In considering a challenge on such a record, the court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014) (quoting *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)). While a plaintiff "may not rest on mere allegations where the defendant has countered those allegations with evidence that the requisite minimum contacts do not exist," *IMO Indus., Inc. v. Seim S.R.L.*, No. 3:05-CV-420-MU, 2006 WL 3780422, at *1 (W.D.N.C. Dec. 20, 2006), if a plaintiff comes "forward with affidavits or other evidence to counter that of the defendant ... factual conflicts must be resolved in favor of the party asserting jurisdiction ...." *Id.*

*Types of Personal Jurisdiction*

There are two types of constitutionally permissible personal jurisdiction: general and specific. *See Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 262 (2017) (referring to general jurisdiction as "all-purpose" jurisdiction and specific jurisdiction as "case-linked" jurisdiction). "A court with general jurisdiction may hear any claim against that defendant, even if all the incidents underlying the claim occurred in a different State." *Id.* (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). General jurisdiction "requires continuous and systematic contacts with the forum state, such that a defendant may be sued in that state for any reason, regardless of where the relevant conduct occurred." *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 292 n.15 (4th Cir. 2009) (internal quotations omitted). "For an individual, the paradigm forum for the exercise of general jurisdiction is the

2

individual's domicile." *Bristol-Myers Squibb Co.*, 582 U.S. at 262 (quoting *Goodyear*, 564 U.S. at 924).

Specific jurisdiction depends on "an affiliation between the forum and the underlying controversy." *Goodyear*, 564 U.S. at 918 (citations omitted). A court may exercise specific jurisdiction over a nonresident defendant if doing so comports with both the forum state's long-arm statute and the Fourteenth Amendment Due Process Clause. *See, e.g., Mitrano v. Hawes*, 377 F.3d 402, 406 (4th Cir. 2004). In North Carolina, where the long-arm statute extends personal jurisdiction to the limits of the Fourteenth Amendment's Due Process Clause, "the statutory inquiry merges with the constitutional inquiry." *Christian Sci. Bd. of Dirs. v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001).

Under the Fourteenth Amendment Due Process analysis, a court may exercise personal jurisdiction "if the defendant has 'minimum contacts' with the forum, such that to require the defendant to defend its interest in that state 'does not offend traditional notions of fair play and substantial justice.'" *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 397 (4th Cir. 2003) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Thus, to determine whether specific jurisdiction exists, the Court must consider "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Carefirst*, 334 F.3d at 396 (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 711–12 (4th Cir. 2002)).

**B. Rule 12(b)(6)**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted" tests whether the complaint is legally and factually sufficient. *See* Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012). A court need not accept a complaint's "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).

The Court, however, accepts all well-pleaded facts as true and draws all reasonable inferences in Plaintiff's favor. *See Conner v. Cleveland Cnty., N. Carolina,* 22 F.4th 412, 416 (4th Cir. 2022); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). In so doing, the Court "must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Pa. Nat'l Mut. Cas. Ins. Co. v. Beach Mart, Inc.*, 932 F.3d 268, 274 (4th Cir. 2019). Construing the facts in this manner, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Pledger v. Lynch*, 5 F.4th 511, 520 (4th Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678).

When deciding a motion to dismiss, "a court considers the pleadings and any materials 'attached or incorporated into the complaint.'" *Fitzgerald Fruit Farms LLC v. Aseptia, Inc.*, 527 F. Supp. 3d 790, 796 (E.D.N.C. 2019) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Further, "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (citation omitted). Ultimately, a motion to dismiss under Rule 12(b)(6) determines only

whether a claim is stated; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

## II.     FACTS AND PROCEDURAL HISTORY

Since 1987, Plaintiff Essex Parts Services, Inc. ("Essex")[1] and Defendant AP Racing, LTD ("AP") have maintained a longstanding commercial relationship involving the sale and distribution of AP brake products—initially to a single NASCAR Cup team, then, beginning in 2020, as the exclusive supplier of brake systems to all NASCAR Cup teams. Doc. No. 2 (First Amended Complaint "FAC") ¶¶ 9–10. In 1999, Defendant Brembo, N.V. ("Brembo") acquired complete ownership of AP.[2] *Id.* ¶ 16.

In 2022, Essex and AP executed a new set of agreements (the "2022 Contracts") under which Essex agreed to exclusively sell and promote AP products, including brake systems and related components, to NASCAR Cup teams and other distribution channels. *Id.* ¶ 14. In return, Essex was designated the "exclusive" United States reseller for the AP products identified in the 2022 Contracts. *Id.* ¶ 15.

In 2014 Brembo entered into an agreement with T.A.W. Performance, LLC ("TAW").[3] The Brembo/TAW agreement granted TAW "exclusive distributor and reseller rights" in the United States for Brembo's motorcycle brake products. *Id.* ¶ 18. As part of that arrangement, TAW paid $1 million to a third party to resolve a claim against Brembo by its prior distributor. *Id.*

---

[1] Essex is incorporated in North Carolina and Richard Martin ("Martin") is its majority shareholder. FAC ¶¶ 1, 25.

[2] Plaintiff alleges that despite AP's claims that it operates independently of Brembo, Brembo appointed AP's board and management. FAC ¶ 16. Moreover, Plaintiff asserts that, beginning in 2025, Brembo regularly communicated with Essex and its employees for guidance on products outside the scope of the 2022 Contracts. *Id.* ¶ 17.

[3] Martin is the sole member of TAW. Plaintiff asserts that, notwithstanding TAW's and Essex's "common ownership," the two companies functioned as entirely separate entities with different officers, employees, and facilities. FAC ¶¶ 19, 29.

Plaintiff alleges that the relationship between Brembo and TAW deteriorated when significant quantities of "gray market" Brembo goods[4] began entering the market through online platforms such as eBay, undermining TAW's profitability. *Id.* ¶¶ 22–24. After a 2016 meeting where Martin "confronted" Brembo about its failure to resolve TAW's many complaints about the gray market goods, Brembo notified TAW that it would be terminating the TAW contract effective July 31, 2017. *Id.* ¶ 25. Litigation followed (the "New York litigation"), with Brembo alleging TAW owed more than $1 million for unsold inventory. *Id.* ¶ 26.

According to Plaintiff, the Brembo/TAW dispute spilled over to Essex because of Martin's ownership interests in both entities, despite Brembo being reminded that Essex and TAW were separate entities. *Id.* ¶ 35. In 2022, Brembo allegedly informed Martin that if TAW did not settle the lawsuit, it was unlikely that "Essex [would] be able to avoid involvement." *Id.* ¶ 35. Then, in 2024, TAW filed for Chapter 7 bankruptcy protection. *Id.* ¶¶ 26–28. Brembo and Martin were TAW's largest creditors, and Martin asserted a claim against TAW exceeding $1 million. *Id.* ¶ 29. In February 2025, nearly a year after the bankruptcy closed, TAW agreed to a consent judgment for nearly $970,000 in the New York litigation with Brembo. *Id.* ¶ 27; *see also* Doc. No. 30-6.

Next, in December 2025, while Essex was renegotiating its contract with AP, Brembo emailed Martin and demanded $350,000—purportedly from Essex—to resolve Brembo's claims against TAW. *Id.* ¶ 40. The FAC is silent on Martin's response. Essex and AP then allegedly "agreed" to new contract terms, and on December 23, 2025, Martin signed a written agreement. *Id.* ¶ 47. But, shortly thereafter, Brembo requested that Essex commit to annual minimum purchase requirements from AP that exceeded the prior contract by $250,000 per year for each year of the

---

[4] The gray market goods were allegedly made by Brembo's Italian distributor and sold via e-Bay and other sites by "European" companies with Brembo's full knowledge and consent. FAC ¶¶ 21–24.

proposed five-year agreement.[5] *Id.* ¶¶ 43–44. Plaintiff contends that this request was simply another effort to recover on the dispute with TAW.[6] *Id.* ¶ 44.

In any event, AP never signed the agreement which Martin signed, Martin later "revoked his signature," and Essex initiated the present action, asserting that Defendants violated the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), and that Brembo interfered with prospective contractual relations between Essex and AP. *Id.* ¶¶ 48, 54–76. Defendants have filed motions to dismiss, which are fully briefed and ripe for this Court's review.

### III.    DISCUSSION

As a threshold issue, Brembo contends that the Court lacks personal jurisdiction over it and that the claims against it must therefore be dismissed. More specifically, Brembo asserts that the Court lacks specific personal jurisdiction[7] because Essex has not demonstrated that its claims arise from or relate to Brembo's purposeful activities directed at North Carolina. *See* Doc. No. 22 at 11. The Court disagrees.

Essex, a North Carolina corporation, alleges that Brembo directed multiple purposeful contacts toward it. These include: a 2022 email sent to Essex's majority shareholder Richard Martin advising that Brembo intended to continue its litigation with TAW—also owned by Martin—and warning that Essex would likely be affected; a 2025 email titled "AP and Essex . Still pending point" which referenced the nearly finalized agreement between AP and Essex and

---

[5] The timing of the demand for additional minimum purchase requirements is not stated in the FAC. However, a Declaration filed concurrently with Essex's Response in Opposition to Brembo's Motion to Dismiss includes a statement from Martin that, on or about January 5, 2026—after he signed the new agreement—AP, acting at the direction of Brembo, proposed the $250,000 per year purchase increase. Doc. No. 30 ¶ 22.

[6] Martin's Declaration asserts that the sales requirement increase stemmed from Brembo's desire to "see something back on a debt" owed. Doc. No. 30 ¶ 22.

[7] Neither party alleges that the Court can exercise general personal jurisdiction over Brembo. *See* Doc. Nos. 21, 29.

simultaneously sought to leverage that agreement in pursuit of a settlement in the TAW litigation; Brembo's decision to reduce the prospective contract length between Essex and AP from ten years to five; Brembo's efforts to increase Essex's purchase requirements from AP by $250,000 annually for each year of the five-year term; and, ultimately, Brembo's act of preventing AP from countersigning the new agreement, followed by Brembo's outside counsel issuing a notice of non-renewal of the 2022 distribution agreements. *See* Doc. Nos. 2, 31.

Although the FAC does not specifically allege that Brembo sent the notice of non-renewal to Essex, the remaining allegations describe conduct expressly aimed at Essex, even when communicated through its majority owner. These contacts were directed at, and had a foreseeable effect on, a North Carolina corporation whose claims arise from those same interactions. Under these circumstances, requiring Brembo to defend this action in North Carolina comports with "fair play and substantial justice." *Int'l Shoe,* 326 U.S. at 316. Accordingly, the Court will exercise specific personal jurisdiction over Brembo.

With jurisdiction established, the Court turns to Essex's substantive claims, which include (1) that Brembo tortiously interfered with its prospective contractual relations with AP, and (2) that both AP and Brembo violated the North Carolina UDTPA.

### A. Interference with Prospective Contractual Relations

Essex's first claim asserts that Brembo, with full knowledge of the decades-long relationship between AP and Essex, prevented AP from renewing its contract with Essex when it did not agree to pay money that was owed by TAW. FAC ¶¶ 58–65. Essex further alleges that because Brembo had no right to seek to collect the TAW debt from Essex, Brembo's alleged interference was with malice and not for the benefit of AP. *Id.* ¶ 64.

North Carolina recognizes a claim for tortious interference with prospective contract ("tortious interference"). *See Owens v. Pepsi Cola Bottling Co. of Hickory, N.C., Inc.,* 330 N.C. 666, 680 (1992) (citing *Coleman v. Whisnant,* 225 N.C. 494, 35 S.E.2d 647 (1945)). The elements mirror those for interference with an existing contract, except that the plaintiff must show the existence of a contract that would have been formed but for the defendant's conduct, rather than an existing agreement. *Nat'l Welders Supply Co. v. Roberts Oxygen Co.*, No. 3:07-CV-350, 2008 WL 1837251, at *1 (W.D.N.C. Apr. 22, 2008) (citing *Beck v. City of Durham*, 154 N.C. App. 221, 232 (2002)). Relevant here, the "mere expectation of a continuing business relationship is insufficient to establish such a claim." *Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enterprises, Inc.*, 546 F. Supp. 3d 440, 454 (M.D.N.C. 2021) (quoting *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair,* LLC, 368 N.C. 693, 701 (2016)).

Thus, to state a claim for tortious interference under North Carolina law, a plaintiff must plausibly allege that: "(1) a prospective contract with a third party existed, (2) the tortfeasor 'maliciously induc[ed]' the third party 'not to enter a contract ... which he would have entered into but for the interference,' and (3) the interference proximately caused damages." *Benjamin v. Sparks*, 173 F. Supp. 3d 272, 288 (E.D.N.C. 2016), *aff'd,* 986 F.3d 332 (4th Cir. 2021) (quoting *Dalton v. Camp*, 353 N.C. 647, 654, 548 S.E.2d 704, 709 (2001)) (additional citation omitted). In addition, a plaintiff "must show that the contract would have ensued but for Defendants' interference." *Beck,* 154 N.C. App. at 232 (quoting *DaimlerChrysler Corp. v. Kirkhart,* 148 N.C. App. 572, 585 (2002), *writ denied, review denied sub nom. Daimlerchrysler Corp. v. H.C. Kirkhart,* 356 N.C. 668 (2003)) (additional citation omitted).

North Carolina recognizes (and treats differently) two categories of actors who may interfere with contractual and prospective contractual relations: "outsiders to the contract and

9

non-outsiders." *Benjamin,* 173 F. Supp. 3d at 289. Outsiders are those who are not parties to the contract and who have "no legitimate business interest of [their] own in the subject matter thereof." *Id.* (quoting *Smith v. Ford Motor Co.*, 289 N.C. 71, 87 (1976)). By contrast, parties who "ha[ve] a legitimate business interest ... in the subject matter" are deemed non-outsiders. *Id.* (quoting *Smith,* 289 N.C. at 87).

Acts taken by non-outsider individuals are generally "presumed" to be carried out on behalf of the corporation and therefore are considered "justified." *Id.* at 290 (quoting *Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 498–500 (1992)). As a result, tortious interference claims against non-outsiders generally fail for lack of the required showing that the defendant acted without justification. *Id.* (collecting cases).

This presumption may, however, be rebutted and a plaintiff may overcome it by demonstrating that the non-outsider acted for an improper purpose. *Id.* (citing *Embree Constr. Grp., Inc.*, 330 N.C. at 498) (additional citations omitted). "To do so, the plaintiff must show that the defendant acted with malice and for a reason 'not reasonably related to the protection of a legitimate business interest.'" *Id.* (quoting *Sellers v. Morton*, 191 N.C. App. 75, 82 (2008)) (additional citation omitted). Yet, it is insufficient to merely allege an improper motive; instead, the "complaint must admit of no motive for interference other than malice." *Id.* (quoting *Pinewood Homes, Inc. v. Harris*, 184 N.C. App. 597, 605 (2007)) (additional citations omitted). *See also Beck,* 154 N.C. App. at 232; *Filmar Racing, Inc. v. Stewart,* 141 N.C. App. 668, 674 (2001) (analyzing tortious interference with both prospective and current contracts and applying the malice analysis to both); *Childress v. Abeles*, 240 N.C. 667, 675 (1954) (defining malice in the context of tortious interference with contract as "the intentional doing of the harmful act without legal justification."); *Essentia Ins. Co. v. Stephens*, 530 F. Supp. 3d 582, 604 (E.D.N.C. 2021)

(quoting *Childress* and applying its definition of malice to a tortious interference with prospective contract claim.).

As explained above, Essex alleges that between 2022 and 2025, because of its lawsuit with TAW, Brembo threatened Essex's relationship with AP, demanded that Essex pay $350,000 to resolve its claims against TAW,[8] and inserted itself into the 2025 Essex and AP contract negotiations by reducing the term from ten to five years and unilaterally adding what Essex believed to be commercially unreasonable terms. Although Essex asserts that Brembo acted with malice, Essex also acknowledges that Defendants were considering whether to "take the business for themselves" instead of continuing its relationship with Essex. *See* FAC ¶ 50. That admission suggests Defendants' actions were at least partly motivated by a legitimate business purpose and undercuts the claim that they acted with a purely malicious purpose in declining to renew the agreement. Further, Plaintiff has not cited authority holding that it can be legal malice for a parent company, in deciding who it and its subsidiaries want to do business with, to consider its past

---

[8] Brembo includes with its Motion to Dismiss the Declaration of Mario Almondo, Brembo's Performance Global Business Unit Chief Officer, and attaches the email that formed the basis of Essex's allegation Brembo demanded $350,000 to resolve the TAW dispute. As the email is explicitly referenced and relied on in the FAC, the Court may properly consider it. The email stated:

> Now that AP and Essex are reaching an agreement, I'm reaching out to see if Brembo and TAW can also resolve the New York litigation at this time. I understand that our counsel in the matter have had some communications concerning settlement since the consent judgment was entered, and TAW's lawyer had discussed a potential settlement in the range of about $350,000. We have not, however, received an actual proposal from your lawyer. At this time, it would be beneficial for all parties to have an amicable resolution of all their disputes, so that we can have a productive relationship going forward. In our preliminary view, a settlement in the amount of $350,000 would be a compromise towards that end.

Doc. No. 23-1 at 2.

experience (including legal disputes) with a company's owner.[9] Thus, based on the allegations of the FAC, Brembo had legitimate business reasons that could lead a "non-outsider" to involve itself in contract negotiations between its subsidiary and a vendor. Or, to put it another way, Essex has not plausibly alleged that Brembo acted without justification or that it had a purely malicious motive. Accordingly, the Court will dismiss this claim.

### B. Violation of the North Carolina UDTPA

Plaintiff also alleges that Brembo violated the UDTPA when it attempted to collect money owed by TAW from Essex, including by "demanding" Essex increase its annual purchases from AP by $250,000, and by preventing AP from entering into a new agreement with Essex when Essex did not agree to pay TAW's debt or to increase its annual purchases from AP. In other words, Essex bases its UDTPA claim on the same facts underlying its claim for tortious interference with prospective contract. Although Plaintiff asserts a UDTPA claim against AP, Plaintiff's sole allegation in that claim is that AP, in conjunction with Brembo, asked Essex to increase its purchases by $250,000 annually for the duration of the proposed contract.

The UDTPA prohibits "unfair or deceptive acts or practices in or affecting commerce that proximately injure[] a plaintiff." *Enck v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 685 F. Supp. 3d 356, 369 (W.D.N.C. 2023) (additional citation omitted). To prevail on a UDTPA claim, a plaintiff must establish that "(1) the defendant committed an unfair or deceptive act or practice; (2) the act or practice … was in or affecting commerce; and (3) the act or practice proximately caused injury to the plaintiff." *Id.* (quoting *Elsayed v. Family Fare LLC*, No. 1:18-CV-1045, 2020

---

[9] To be clear, the Court does not intend to convey that a company has a blank check to seek to resolve legal disputes with one company through demands to a different company. For example, allegations of breach of a legal duty to negotiate with the second company or of an attempt to evade the prior ruling of a court with respect to the amount sought to be collected—neither of which is alleged here—might put the case in a different light.

12

WL 4586788, at *14 (M.D.N.C. Aug. 10, 2020), *aff'd,* No. 21-1744, 2023 WL 5842301 (4th Cir. Sept. 11, 2023)).

Here, Essex's UDTPA claim against Brembo rests on the same facts as its tortious interference claim. To be sure, a claim for tortious interference with prospective contract can serve as the basis for a UDTPA claim. *Med1 NC Servs., L.L.C. v. Med1 Plus, L.L.C.*, No. 19 CVS 1983, 2020 WL 930651, at *12 (N.C. Super. Feb. 26, 2020) (citing *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 664 (1988)) (additional citations omitted). However, where, as here, Essex has failed to plausibly allege tortious interference, its UDTPA claim must also be dismissed. *See Tucker Auto-Mation of N. Carolina, LLC v. Russell Rutledge & Rutledge Commercial, LLC*, No. 1:15-CV-893, 2017 WL 2930926, at *6 (M.D.N.C. July 10, 2017) (dismissing UDTPA claim to the extent that it relied on implausibly alleged tortious interference with prospective contract claim); *Beverage Sys. of the Carolinas,* 368 N.C. at 702 ("Plaintiff's [UDTPA] claim presupposes success of at least one of plaintiff's contract claims. Because we hold that each of those claims fails, plaintiff's unfair and deceptive practices claim also fails.").

Likewise, Plaintiff's allegation that AP conveyed Brembo's "demand" that Plaintiff increase its purchases by $250,000 each year falls well short of establishing a UDTPA violation. And, to the extent Essex argues that Brembo's and AP's conduct violates public policy, that contention is unpersuasive. While Brembo's conduct may appear commercially aggressive to some, advising Martin that TAW's failure to satisfy its outstanding judgment could affect Defendants' future relationships with Essex, and later acting consistently with that representation, is not, on these alleged facts, beyond the scope of permissible business leverage. Moreover, no principle of North Carolina law requires a company to renew, extend, or negotiate a contract with another business, absent a legal duty to do so, nor does North Carolina law generally prohibit a

13

company from lawfully considering its experience with related entities when deciding whether to enter or continue a contractual relationship with a vendor. Accordingly, this claim will be dismissed as to Brembo and AP.

## IV.    ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Defendant Brembo's Motion to Dismiss (Doc. No. 21) is **GRANTED**;

2. Defendant AP's Motion to Dismiss (Doc. No. 15) is **GRANTED**; and

3. The Clerk is directed to close this matter in accordance with this Order.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: June 2, 2026

Kenneth D. Bell
United States District Judge